IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

C.K. LEE                          §
                                  §
              Plaintiff,          §
                                  §
v.                                §      CIVIL ACTION NO. H-09-2792
                                  §
CATLIN SPECIALTY INSURANCE        §
COMPANY, JUSTIN CARROLL, and      §
ENGLE MARTIN &                    §
ASSOCIATES, INC.,                 §
                                  §
              Defendants.         §

**MEMORANDUM OPINION AND ORDER**

    C.K. Lee brings this action against Catlin Specialty Insurance Company alleging that Catlin wrongfully handled an insurance claim that Lee submitted for hurricane damage to his commercial property.[1]  Pending before the court is Catlin Specialty Insurance Company's Motion for Partial Summary Judgment (Docket Entry No. 28).  For the reasons explained below, Catlin's motion will be granted in part and denied in part.

---

    [1]On August 2, 2010, defendants Justin Carroll and Engle Martin & Associates, Inc. were dismissed from this action after reaching a settlement agreement with Lee.  Order Granting Motion to Dismiss Engle Martin & Associates, Inc. and Justin Carroll, Docket Entry No. 27; Catlin Specialty Insurance Company's Motion for Partial Summary Judgment ("Catlin's Motion"), Docket Entry No. 28, p. 1.

## I.  Factual and Procedural Background

**A.  Underlying Facts**

C.K. Lee owns a commercial shopping center in northwest Houston.[2]  Prior to the events giving rise to this action Catlin issued a commercial-property insurance policy to Lee,[3] which was effective from June 23, 2008, to June 23, 2009,[4] and which provided coverage of up to $1.7 million for wind-storm damage with a $36,000 deductible.[5]  In the evening of September 12 and the early morning of September 13, 2008, Hurricane Ike, a category 2 hurricane, inflicted substantial destruction throughout the Texas Gulf Coast area.[6]  On September 24, 2008, Lee submitted a loss notice to Breeden Insurance Agency, his insurance agent, claiming that the roof of his shopping center sustained damage from the hurricane.[7]  On the same day Breeden forwarded the loss notice to American Underwriting Managers ("AUM"), which in turn forwarded it to

---

[2]See Catlin's Motion, Docket Entry No. 28, p. 1.

[3]Id. at 1-2.

[4]Property Loss Notice, Exhibit A-1 to Catlin's Motion, Docket Entry No. 28, p. 1.

[5]Immediate Advice from Engle Martin & Associates, Inc. to Catlin, Oct. 10, 2008, Exhibit A-7 to Catlin's Motion, Docket Entry No. 28, p. 2.

[6]See id. p. 2.

[7]Property Loss Notice, Exhibit A-1 to Catlin's Motion, Docket Entry No. 28, p. 1.

Catlin.[8]   Catlin sent AUM a letter on September 25, 2008, acknowledging it had received Lee's claim.[9]

On the same day that Catlin acknowledged receipt of Lee's insurance claim it authorized Engle Martin & Associates, Inc. ("Engle Martin") to represent Catlin's interests in the adjustment of the claim.[10]  Catlin and Engle Martin had informally agreed that Engle Martin would be the independent adjusting firm for all of the Hurricane Ike claims submitted to Catlin.[11]  Engle Martin attempted to contact Lee several times by telephone between September 26 and October 2, 2008, to arrange for an inspection of Lee's property, but Lee was out of the country.[12]  On October 12, 2008, Catlin sent Lee a letter informing him that Rick Lathrum had been assigned as

---

[8]E-mail from Judy Breeden to AUM, Sept. 24, 2008, Exhibit A-2 to Catlin's Motion, Docket Entry No. 28, p. 1; Fax from AUM to Catlin, Sept. 24, 2008, Exhibit A-3 to id., p. 1.

[9]General Agent New Claim Acknowledgment from Catlin, Sept. 25, 2008, Exhibit A-4 to id., p. 1.

[10]Acknowledgment Letter from Engle Martin to Catlin, Sept. 26, 2008, Exhibit A-6 to id., p. 1.

[11]Deposition of Clinton Thute, Apr. 23, 2010, Exhibit A to Plaintiff's Response, Docket Entry No. 38, p. 20:2-6.

[12]Invoice from Engle Martin ("Invoice"), Exhibit A-8 to id., p. 1; id., p. 3.  Because the loss notice incorrectly stated the address for Lee's property, Engle Martin investigated the wrong property on October 2 and 3, 2008, while Lee was out of the country.  Invoice, Exhibit A-8 to id., p. 1; Property Loss Notice, Exhibit A-1 to id., p. 1.

the Claims Examiner for Lee's claim,[13] and on November 9, 2008, Engle Martin sent Lee a letter to schedule a time to investigate the property.[14]

Mike Bass of Emergency Services 24, Inc. ("Emergency Services") contacted Engle Martin on November 13, 2008, and stated that he had been retained by Lee to meet with representatives of Engle Martin and to reach an agreement on the scope of the property's damages.[15]  On November 19, 2008, representatives of Engle Martin, along with Bass, inspected Lee's property.[16]  Engle Martin observed evidence of roof repairs that had apparently been made both before and after Hurricane Ike.[17]  Engle Martin also observed debris in various sections of the roof and interior water damage, which led it to conclude that an infrared scan of the roof was necessary to help identify which damages, if any, were attributable to wind and which, if any, were attributable to subpar prior repairs or natural deterioration.[18]

---

[13]Letter from Lathrum to Lee, Oct. 12, 2008, Exhibit A-9 to id., p. 1.

[14]First Report from Engle Martin & Associates, Inc. to Catlin, Dec. 11, 2008 ("Engle Martin's First Report"), Exhibit A-10 to Catlin's Motion, Docket Entry No. 28, p. 4.

[15]Id.

[16]Id.

[17]Id.

[18]Id.

Engle Martin retained a roofing consultant and engineering firm, Project, Time & Cost ("PT&C"), to conduct an infrared inspection of the roof.[19]  Engle Martin also sent Lee a letter requesting (1) a copy of the invoice from the emergency roof repairs that Lee ordered after the hurricane and (2) copies of the leases between Lee and the four tenants that occupied the property.[20]  The letter informed Lee that an infrared inspection was going to be conducted and that Catlin continue to reserve its rights under the policy.[21]

On December 11, 2008, PT&C inspected the roof and observed that (1) there was "no wind-related damage" to the roof covering, (2) "the roof membrane was brittle and deteriorated across the entire roof," (3) water infiltration, viewed through infrared photographs, existed in areas of previous repairs and in areas where normal wear and weathering had occurred, (4) there was "poorly installed roofing material along [the] parapet wall," and (5) "many areas of gravel ballast [were] missing prior to Hurricane Ike," confirmed by pre-hurricane aerial photographs.[22]  Based on these findings, PT&C concluded that there was no wind-related

---

[19]Id.

[20]Letter from Engle Martin to Lee, Dec. 11, 2008, Exhibit A-11 to Catlin's Motion, Docket Entry No. 28, p. 1.

[21]Id.

[22]PT&C's Findings Report, attachment to Exhibit A-12 to Catlin's Motion, Docket Entry No. 28, p. 2.

damage to the roof and no breaches or openings created by wind or wind-borne debris, and that the roof covering had exceeded its life expectancy and was in need of replacement due to normal wear and weathering.[23]

Engle Martin submitted this information to Catlin in a report dated February 10, 2009, and noted that it still had not received the invoice from Emergency Services pertaining to the repairs it had made to Lee's roof.[24]   Engle Martin also sent a letter to Lee informing him of the status of the investigation and again requesting copies of the repair invoice and the leases.[25]   On February 14, 2009, Emergency Services told Engle Martin that it wanted to begin repairing Lee's roof, but Engle Martin replied that the investigation was ongoing and that there was not yet an agreement concerning the scope of damages or the price of repair.[26]

On February 19, 2009, Van Fischer of PT&C reinspected the roof, again concluding that there was no wind-related damage.[27]

---

[23]Id. at p. 3.

[24]Updated Report from Engle Martin to Catlin, Feb. 10, 2009 ("Engle Martin's Updated Report"), Exhibit A-12 to Catlin's Motion, Docket Entry No. 28, pp. 1-3.

[25]Letter from Engle Martin to Lee, Feb. 10, 2009, attachment to Exhibit A-12 to Catlin's Motion, Docket Entry No. 28, p. 1.

[26]Letter from Engle Martin to Lee, Feb. 17, 2009, Exhibit A-13 to Catlin's Motion, Docket Entry No. 28, p. 1.

[27]Final Updated Report from Engle Martin to Catlin ("Engle Martin's Final Report"), Mar. 20, 2009, Exhibit A-15 to Catlin's Motion, Docket Entry No. 28, p. 2.

Fischer based this conclusion on PT&C's initial observations as well as the following additional observations: (1) there was no "perimeter parapet wall flashing damage" anywhere on the roof, which is significant, according to Fischer, because wind damage "typically causes parapet wall flashing to become unfastened from the underlying nailer board"; and (2) a light-weight styrofoam insulation board that was installed before the hurricane had not been displaced, which made it "highly improbable" that wind damage compromised the roof.[28]   Based on PT&C's findings, Engle Martin concluded that the damage to Lee's roof was not caused by winds from Hurricane Ike and submitted a detailed report that included this conclusion to Catlin on March 20, 2009.[29]

Lee's contractor, Emergency Services, prepared a report on March 23, 2009, estimating that the total cost of repairing the roof would be $871,187.50 and that the cost of repairing the entire building would be approximately $1.3 million.[30]   Road Runner Restoration, a contractor retained by Engle Martin, concluded that the cost of repairing the roof would be $22,864.77.[31]

---

[28]Id.

[29]Id. pp. 1-4.

[30]Estimate Report by Emergency Services, Exhibit B to Catlin's Motion, Docket Entry No. 28, pp. 7-8.

[31]Engle Martin's Final Report, Exhibit A-15 to Catlin's Motion, Docket Entry No. 28, p. 3.

**B.    Procedural History**

Lee initiated this action in Texas state court on July 14, 2009, alleging breach of contract, breach of the duty of good faith and fair dealing, fraud, and violations of the Texas Insurance Code and the Texas Deceptive Trade Practices-Consumer Protection Act ("DTPA").[32]   The defendants removed the action on August 28, 2009.[33] On August 2, 2010, the court dismissed defendants Justin Carroll and Engle Martin with prejudice after they reached a settlement agreement with Lee.[34]   On August 5, 2010, Catlin moved for partial summary judgment with respect to Lee's extra-contractual claims — i.e., all of Lee's claims other than his breach-of-contract claim — arguing that there is a bona fide dispute concerning the cause of the damages and that there is no evidence of bad faith, fraud, or of violations of the Insurance Code or DTPA.[35]   Lee responds that there are genuine issues of material fact with respect to each of his extra-contractual claims.[36]

---

[32]Plaintiff's Original Petition, Exhibit C to Joint Notice of Removal of Defendants Catlin Specialty Insurance Company, Engle Martin & Associates, Inc., and Justin Carroll ("Notice of Removal"), Docket Entry No. 1, ¶¶ 17-32.

[33]Notice of Removal, Docket Entry No. 1.

[34]Order Granting Motion to Dismiss Engle Martin & Associates, Inc. and Justin Carroll, Docket Entry No. 27; Catlin's Motion, Docket Entry No. 28, p. 1.

[35]Catlin's Motion, Docket Entry No. 28, p. 1.

[36]Plaintiff's Response to Defendant Catlin Specialty Insurance Company's Motion for Partial Summary Judgment ("Plaintiff's

## II.  **Standard of Review**

Summary judgment is authorized if the movant establishes that there is no genuine dispute about any material fact and the law entitles it to judgment.  Fed. R. Civ. P. 56(a).  Disputes about material facts are "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S. Ct. 2505, 2511 (1986).  The Supreme Court has interpreted the plain language of Rule 56(c) to mandate the entry of summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548, 2552 (1986).

A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (quoting Celotex, 106 S. Ct. at 2553-54).  If the moving party meets this burden, Rule 56(c) requires the nonmovant to show that specific facts exist over which there is a genuine issue for trial.  Id. (citing Celotex, 106 S. Ct. at 2553-54).  A party asserting that a fact

---

Response"), Docket Entry No. 38, ¶ 3.

cannot be or is genuinely disputed must support the assertion by either (1) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, admissions, and interrogatory answers; or (2) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(A)-(B). In reviewing the evidence "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods. Inc., 530 U.S. 133, 120 S. Ct. 2097, 2110 (2000).

When a party chooses not to respond to all or part of a summary-judgment movant's validly supported motion, the court will not merely enter a "default" summary judgment, but it may accept as undisputed the facts the movant provides in support of its motion. See Eversley v. MBank Dallas, 843 F.2d 172, 173-74 (5th Cir. 1988) (finding that when the plaintiff failed to oppose the defendant's motion for summary judgment, the district court "did not err in granting the motion" because the motion established a prima facie showing of the defendant's entitlement to judgment).

-10-

## III.   Analysis

### A.   Bad Faith Claims

Catlin argues that Lee's "common law and statutory bad faith claims are precluded" because a bona fide dispute exists as to whether the damages to Lee's property are covered by the insurance policy.[37]   In response, Lee argues that Catlin's reliance on Engle Martin's biased expert report was unreasonable and raises a factual issue as to whether a bona fide dispute existed.[38]

### 1.   Applicable Law

"Under Texas law, there is a duty on the part of the insurer to deal fairly and in good faith with an insured in the processing of claims." Higginbotham v. State Farm Mut. Automobile Ins. Co., 103 F.3d 456, 459 (5th Cir. 1997) (citing Arnold v. Nat'l Cnty. Mut. Fire Ins. Co., 725 S.W.2d 165, 167 (Tex. 1987)).   To prove that an insurer acted in bad faith in violation of Texas common law, an insured must show that the insurer failed to settle the claim even though it "knew or should have known that it was reasonably clear that the claim was covered." Universe Life Ins. Co. v. Giles, 950 S.W.2d 48, 54-55 (Tex. 1997).   The statutory bad faith standard parallels the common law formulation.   See Tex. Ins. Code § 541.060(a)(2)(A) (providing that an insurer

---

[37]Catlin's Motion, Docket Entry No. 28, p. 8.

[38]Plaintiff's Response

engages in an unfair settlement practice by "failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim with respect to which the insurer's liability has become reasonably clear").

"Evidence that merely shows a bona fide dispute about the insurer's liability on the contract does not rise to the level of bad faith." Transp. Ins. Co. v. Moriel, 879 S.W.2d 10, 17 (Tex. 1994). On the other hand, denying a claim solely in reliance on an expert's report does not shield the insurer from bad faith liability "if there is evidence that the report was not objectively prepared or the insurer's reliance on the report was unreasonable. State Farm Lloyds v. Nicolau, 951 S.W.2d 444, 448 (Tex. 1997). In determining the reasonableness of an insurer's decision a court reviews the facts that were available to the insurer at the time of denial. Vile v. Security Nat'l Ins. Co., 788 S.W.2d 566, 567 (Tex. 1990).

2.   Whether Catlin Knew or Should Have Known That It Was
     Reasonably Clear Lee's Claim Was Covered

The investigations conducted by Engle Martin and PT&C support Catlin's decision to deny Lee's claim. Engle Martin, the independent adjuster Catlin retained to investigate the claim, concluded that the damage to Lee's roof was not attributable to wind-related causes. Engle Martin's conclusion was based on both its own observations when it inspected the roof with Mike Bass from

-12-

Emergency Services and on PT&C's two inspections.[39] Representatives of Engle Martin inspected the roof with Bass on November 19, 2008, and observed evidence of pre-hurricane repairs and objects with sharp corners that "could have punctured the roof membrane."[40] They also entered each of the four stores in the shopping center and observed evidence of interior water damage.[41] Based on these observations Engle Martin hired PT&C to conduct an infrared scan of the roof to determine whether there was evidence that the roof had already been damaged — by low-quality repairs or natural deterioration — before the hurricane.[42]

The second inspection was conducted by Van Fischer of PT&C on December 11, 2008.[43] Fischer concluded that (1) there was "no wind-related damage to the roof covering," (2) there were "no breaches" or "openings created by wind" or "wind-borne debris" that would have resulted in "the direct infiltration of water through the building envelope," (3) the "roof covering had exceeded its life

---

[39]Engle Martin's First Report, Exhibit A-10 to Catlin's Motion, Docket Entry No. 28, p. 4; PT&C's Findings Report, attachment to Exhibit A-12 to id., p. 2; Engle Martin's Final Report, Mar. 20, 2009, Exhibit A-15 to id., p. 2.

[40]Engle Martin's First Report, Exhibit A-10 to Catlin's Motion, Docket Entry No. 28, p. 4.

[41]Id.

[42]Id.; Catlin's Motion, Docket Entry No. 28, p. 3 n.4.

[43]Engle Martin's Updated Report, Exhibit A-12 to Catlin's Motion, Docket Entry No. 28, p. 2.

expectancy and was in need of replacement due to normal wear and weathering," and (4) the roof's "water-shedding capability ha[d] been compromised" and that roof leaks should therefore be anticipated.[44]   After a follow-up telephone call with an Engle Martin employee, Fischer concluded that he needed to reinspect the roof to determine whether Emergency Service's repairs of Lee's roof constituted temporary or permanent repairs.[45]   Fischer reinspected the roof on February 19, 2009, and again concluded that there was no wind-related damage.[46]   Fischer also concluded that Emergency Service's repairs constituted temporary repairs.[47]

It was not reasonably clear to Catlin, based on this evidence, that the damages were covered by the insurance policy.   The roof was inspected once by an independent adjuster and twice by a roof consultant, and none of the inspectors concluded that the damages were covered by the policy.   Catlin was not privy to any information that concluded otherwise.

But Catlin's reliance on the reports from these inspections, standing alone, does not preclude a bad faith claim if there is

---

[44]PT&C's Findings Report, attachment to Exhibit A-12 to id., p. 3.

[45]Engle Martin's Updated Report, Exhibit A-12 to Catlin's Motion, Docket Entry No. 28, p. 2.

[46]Engle Martin's Final Report, Mar. 20, 2009, Exhibit A-15 to Catlin's Motion, Docket Entry No. 28, p. 2.

[47]Id. at 2.

evidence that the reports were not objectively prepared or that Catlin's reliance was unreasonable. _Nicolau_, 951 S.W.2d at 448. Lee argues that there is a genuine issue of fact as to both the objectivity of the reports and the reasonableness of Catlin's reliance.[48] Specifically, Lee argues that the following facts taken together preclude summary judgment: (1) "Catlin wholly failed to investigate or attempt to reconcile the apparent contradictions of the conclusions found in [Engle Martin's] and PT&C's reports with those of Bass, Plaintiff's expert"; (2) Catlin failed to investigate its experts' qualifications; (3) "Catlin had no procedures for resolving the dispute between experts" or for objectively investigating contested claims"; and (4) Engle Martin's report was biased because the company had a financial interest in preparing reports that favored Catlin's position.[49]  In support of these arguments Lee relies on _Nicolau_ and _State Farm Lloyds v. Johns_, No. 93-00323-E, 1998 WL 548887 (Tex. App.—Dallas 1998, no pet.) (not designated for publication).

In _Nicolau_, the Texas Supreme Court affirmed the jury's finding that an insurer acted in bad faith when it denied a claim that the insureds, Ioan and Liana Nicolau, brought under a homeowners insurance policy. _Nicolau_, 951 S.W.2d at 446, 450. The Nicolaus sought coverage for extensive foundation damage to their

_____

[48]Plaintiff's Response, Docket Entry No. 38, ¶¶ 11–18.

[49]_Id._

-15-

home, which they contended was caused by a covered condition, plumbing leakage, and which the insurer contended was caused by a an uncovered condition, either an "inherent vice" or a "settling" problem. Id. at 447. The Court concluded that there was "some evidence" that the insurer knew or should have known that it was reasonably clear that the insured's claim was covered. Id. at 448. This conclusion was based on evidence in the record that the expert's reports were "not objectively prepared," that the insurer "was aware of [the expert's] lack of objectivity," and that the insurer's "reliance on the reports was merely pretextual." Id.

Similarly, the appellate court in Johns affirmed the jury's finding that the insurer acted in bad faith when it denied an insured's claim for foundation damage. Johns, 1998 WL 548887, at *7.[50] The insured and the insurer disagreed about whether the damage was covered by the applicable homeowners policy, and the court concluded that the evidence could have persuaded a jury that the insurer's reliance on its expert's report was unreasonable. Id. at *5.

The facts of Nicolau and John, however, are distinguishable from those in this action. First, in Nicolau and Johns the insurers were faced with competing conclusions as to the cause of the foundation damage. Nicolau, 951 S.W.2d at 449–50; Johns, 1998

---

[50]The court notes that Johns, as an unpublished case, lacks precedential value, but will include the case in its analysis to the extent it applies the principles set forth in Nicolau.

WL 548887, at *5-6.  In <u>Nicolau</u> the insureds hired a foundation-repair contractor, a structural engineer, and a licensed civil engineer, all of whom concluded that the foundation damage was attributable to a "significant leak in the plumbing system." <u>Nicolau</u>, 951 S.W.2d at 446-47.  The Nicolaus' insurer referred the claim to an adjuster, who twice reported to the insurer that it was doubtful that the damage was attributable to plumbing leakage.  <u>Id.</u> at 447.  The Nicolaus then forwarded to their insurer the report from the engineering firm that reached the opposite conclusion. <u>Id.</u>  After receiving the plaintiff's competing report the insurer authorized its adjuster to obtain a second opinion from an engineering company.  <u>Id.</u>  The company selected by the adjuster concluded that the foundation damage was not related to the water leak and the insurer subsequently denied the portion of the Nicolaus' claim relating to the foundation repair.  <u>Id.</u>  In response, the Nicolaus retained a professional engineer with an expertise in soils analysis, who concluded that the plumbing leak had traveled "great distances" throughout the sand layer underneath the house.  <u>Id.</u>  The insurer and the adjuster's engineering company reviewed this report but concluded that its findings were unfounded.  <u>Id.</u>  In sum, the insurer decided to rely on the experts hired by its adjuster despite being in possession of two separate experts' reports that reached the opposite conclusion.

Likewise, the insurer in <u>Johns</u> was in possession of competing conclusions as to the cause of the insured's foundation damage. The insurer's adjuster retained a professional engineer to investigate the home, and the engineer concluded that the problems were caused by "normal foundation movement." <u>Johns</u>, 1998 WL 548887, at *4. In response, the insured hired a geotechnical engineer specializing in soil conditions to investigate the home, and the engineer concluded that the foundation distress was caused by plumbing leaks. <u>Id.</u> at *5. The insurer's engineer reviewed this competing report but concluded it was "not thorough" and "too general." <u>Id.</u> The insurer's engineer never inspected the home for plumbing leaks and did not reinspect the property after reviewing the competing report. <u>Id.</u> The insurer nevertheless decided to "go with the report that [its engineer] had supplied" and denied the claim. <u>Id.</u>

Here, Catlin's decision to deny the claim was based on Engle Martin's and PT&C's conclusions that the damages to Lee's roof were caused by natural deterioration and low-quality prior repairs instead of wind.[51] In Lee's response to Catlin's motion he argues:

> In an attempt to verify [PT&C's] conclusions, Plaintiff retained Mike Bass ("Bass") of Emergency Services to conduct a separate inspection. Bass' inspection revealed that the roof had sustained substantial damage caused by wind. On behalf of Plaintiff, Bass set forth his conclusions regarding the roof to Catlin, where they were

---

[51]Engle Martin's Updated Report, Exhibit A-12 to Catlin's Motion, Docket Entry No. 28, p. 2.

> ultimately ignored. . . . Despite having been presented
> with evidence from Plaintiff's expert that the roof <u>did</u>
> in fact suffer severe wind related damage, Catlin
> steadfastly held to the position of its expert that "the
> damages sustained at the loss location were not
> attributable to wind."[52]

The record does not contain a report with conclusions that conflict with those formulated by Engle Martin and PT&C.  The only document in the record that was prepared by Emergency Services is an estimate of the cost of repairing the exterior and interior of the shopping center and of repairing the roof.[53]  The estimate does not contain any statements or conclusions relating to the cause of the damages.

Instead of presenting a report that contradicts Catlin's findings, Lee bases its argument exclusively on an answer that Rick Lathrum, one of Catlin's senior claims examiners, gave during his deposition.  Lathrum answered "yes" to the following question: "Both sides, the insured and the contractor, disagreed with your expert and your independent contractor on the central issue in the case and that was did Hurricane Ike cause the need for a roof replacement?"[54]  Later in the deposition, however, Lathrum appears to disagree with the notion that there was a competing report:

---

[52]Plaintiff's Response, Docket Entry No. 38, ¶¶ 7-8.

[53]Estimate by Emergency Services, Exhibit B to Catlin's Motion, Docket Entry No. 28, pp. 1-8.

[54]Deposition of Rick Lathrum, Exhibit C to Plaintiff's Response, Docket Entry No. 38, p. 51:5-10.

A:  Well, I based the approach on [sic] the claim on what the people I hired were reporting to me.

Q:  And other people were saying other stuff and Catlin has no procedure in place to resolve that difference?

A:  Well, we had an estimate from a contractor.[55]

Nevertheless, even if it can be gleaned from Lathrum's deposition that he believed there were competing experts' reports, there is nothing in the record showing that Catlin's decision to believe its own experts, rather than other experts, was unreasonable.  In contrast to <u>Nicolau</u> and <u>Johns</u>, there is nothing in the record that indicates what Emergency Services concluded, if it came to a conclusion, or what observations supported its conclusion. Furthermore, there is nothing in the record indicating that any of the companies used to investigate the roof, whether retained by Lee or Catlin, were unqualified.

Lee argues that there is a genuine issue as to the reasonableness of Catlin's reliance on Engle Martin's and PT&C's reports because Catlin was aware that they were not objectively prepared.  The evidence shows that Catlin and Engle Martin entered into an informal agreement that Engle Martin would be the independent adjusting firm with respect to all of the Hurricane Ike claims, and Catlin assigned approximately 200 such claims to Engle

---

[55]<u>Id.</u> at 122:1-6.

Martin.[56]  In addition, Catlin acknowledged that at the time it handled Lee's claim there were no written procedures in place on how to investigate property insurance claims or to guide employees when they were faced with competing experts' reports.[57]  These facts standing alone, however, could not lead a reasonable juror to conclude that Catlin's reliance was unreasonable.  The fact that Catlin had not created written procedures for employees contemplating competing experts' reports has no bearing on Catlin's decision in this case because there is not a report in the record that conflicts with the findings found in Engle Martin's and PT&C's reports.  In addition, these facts viewed collectively are not on par with the evidence that supported the jury's findings in Nicolau and Johns.

In Nicolau the evidence showed that the engineering company selected by the insurer did a "substantial amount" of work for insurance companies.  An expert also testified that out of the eighty or ninety reports he had reviewed that were produced by the company, only two had concluded that foundation damage was caused by plumbing leaks, and that to his knowledge the engineers who made those conclusions never again worked on a slab-foundation case.

---

[56]Deposition of Clinton Thute, Exhibit A to Plaintiff's Response, Docket Entry No. 38, p. 20:4-12.

[57]See Deposition of Rick Lathrum, Exhibit C to Plaintiff's Response, Docket Entry No. 38, p. 15:5-21; Deposition of Gytis Gavelis, Exhibit D to Plaintiff's Response, Docket Entry No. 38, pp. 41:19-42:25.

Nicolau, 951 S.W.2d at 448-49.  Similarly, in Johns "[m]ost of" the engineer's work came from insurance companies.  Johns, 1998 WL 548887, at *4.  Here, although Catlin acknowledges that it has sent Engle Martin, an adjuster, over 200 Hurricane Ike claims, there is nothing in the record that shows what percentage or portion of Engle Martin's business comes from insurance companies.

As evidence that Engle Martin did not act objectively, Lee points to an email between an employee of Engle Martin, Justin Carroll, and an employee of PT&C, in which Carroll states:  "What we will need to support our argument is [sic] photographs of the temporary repair, as well as photos of repairs present on other areas of the roof for comparison purposes."[58]  But this e-mail was sent after PT&C had already inspected the roof and concluded that the damages were not caused by wind.[59]  The e-mail was directing PT&C to reinspect the roof to follow up on PT&C's initial conclusion that some roof repairs had been done properly and some had not.  Furthermore, there is no evidence that PT&C's conclusions relating to the cause of the damages was biased, that it works primarily with insurance companies, or even that it investigated other Hurricane Ike claims.

---

[58]E-mail from Justin Carroll to Bryan Newell and Van Fischer, Feb. 17, 2009, Exhibit E to Plaintiff's Response, Docket Entry No. 38, p. 1.

[59]See Engle Martin's Updated Report, Exhibit A-12 to Catlin's Motion, Docket Entry No. 28, p. 2.

-22-

The Texas Supreme Court's conclusion in <u>Nicolau</u> that there was "some evidence" supporting a finding of bad faith was based on the engineers' bias in tandem with evidence that the insurer knew that it received biased reports.  <u>See</u> <u>Nicolau</u>, 951 S.W.2d at 448-50. Here, even if it were determined that Engle Martin and PT&C worked primarily with insurers, there is no evidence that the investigations were outcome-oriented or that Catlin expected to receive reports concluding that the claim should be denied.  In <u>Nicolau</u> there was evidence that the insurer selected the particular engineering company to investigate the property because of the company's "general view" that plumbing leaks rarely cause foundation damage.  <u>Id.</u> at 448-49.  There is nothing in the record here that suggests that Engle Martin or PT&C held predetermined general views concerning the cause of roof damage.  The evidence in <u>Nicolau</u> also showed that the engineering firm used by the insurer never examined the leaking pipe and failed to take samples of the soil for testing, and that the insurer knew that its engineers had not reinspected the property after they received the Nicolaus' conflicting report.  <u>Id.</u> at 449-50.  The record here shows that Engle Martin and Emergency Services first inspected the property together, and that PT&C subsequently conducted an initial inspection of the roof and then a reinspection of the roof at Engle Martin's request.

The evidence shows no more than a bona fide dispute between Catlin and Lee as to whether the damages to the roof were covered by Lee's policy.  See Avila v. State Farm Fire & Cas. Co., 147 F. Supp.2d 570, 577-79 (W.D. Tex. 1999) (granting summary judgment to the insurer on the insured's bad faith claims based on evidence that the insurer hired two experts who concluded that the damages fell outside the policy and evidence that the report submitted by the insured did not conflict with the insurer's conclusion at the time the claim was denied).

The summary-judgment evidence is insufficient to persuade a reasonable juror that Catlin knew or should have known that it was reasonably clear that Lee's claim was covered.  Giles, 950 S.W.2d at 54-55.  Lee does not raise a genuine issue of material fact in support of its contentions that Engle Martin's reports were not objectively prepared or that Catlin's reliance on the reports was unreasonable.  Accordingly, Catlin's motion with respect to Lee's common law and statutory bad faith claims will be granted.


**B.   Claims of Unfair Settlement Practices**

Lee alleges that Catlin violated the Texas Insurance Code by engaging in the following unfair settlement practices:

> (a)  Misrepresenting to Plaintiff material facts or policy provisions relating to the coverage at issue;
>
> (b)  Failing to promptly provide Plaintiff with a reasonable explanation of the basis in the Policy,

in relation to the facts or applicable law, for [Catlin's] denial of the Claim; and

(c)  Failing within a reasonable time to affirm or deny coverage of the Claim to Plaintiff or to submit a reservation of rights to Plaintiff.[60]

Tex. Ins. Code § 541.060(a)(1), (3), (4).

Lee's claim that Catlin made material misrepresentations about the policy or the coverage lacks merit because there is no evidence of any such misrepresentations in the record. Lee testified at his deposition that he has never had any discussions with Catlin about the terms of the policy.[61] When asked what misrepresentations Catlin made concerning the coverage, Lee responded that Catlin made a misrepresentation when it failed "to pay [Lee] for that replacement of the roof."[62] Lee also argues in his response to the summary-judgment motion that Catlin made a misrepresentation when it informed Lee "that the covered loss to the Property's roof was not covered."[63] Lee stated he had not read every item of the

---

[60]Plaintiff's Original Petition, Exhibit C to Notice of Removal, Docket Entry No. 1, ¶¶ 19-20. Lee also alleges causes of action under Texas Insurance Code Section 541.060(a)(2) and (7), but since these provisions are included within Lee's bad faith claims, they are governed by the court's grant of summary judgment in favor of Catlin. See Tex. Mut. Ins. Co. v. Ruttiger, 265 S.W.3d 651, 661 n.18 (Tex. App.—Houston [1st Dist.] 2008, pet. granted); Higginbotham, 103 F.3d at 460.

[61]Deposition of C.K. Lee, Exhibit C to Catlin's Motion, Docket Entry No. 28, p. 42.

[62]Id. at 90.

[63]Plaintiff's Response, Docket Entry No. 38, ¶ 20.

policy.[64]  As explained above Catlin had a reasonable basis for determining that the damage to the roof was not covered by the policy.  Thus, a reasonable juror could not conclude that Catlin's denial of Lee's claim constitutes a misrepresentation.

Lee's claims that Catlin failed to deny coverage within a reasonable time and failed to promptly provide Lee with a reasonable explanation of its basis for denying the claim also fail as a matter of law.  Lee testified at his deposition that he was aware that Catlin denied his claim because the amount of covered damages was less than the $36,000 deductible on the policy.[65] Catlin argues that based solely on this evidence it is entitled to summary judgment on Lee's claim that Catlin failed to promptly provide Lee with a reasonable basis for denying his claim.[66]  But Lee's deposition is undated and therefore does not assist the court in determining whether Catlin's explanation for denial was delivered promptly or not.  The evidence shows, however, that Catlin acted with reasonable timeliness with respect to its investigation of the claim and its communications with Lee regarding the claim.

---

[64]Id.

[65]Deposition of C.K. Lee, Exhibit C to Catlin's Motion, Docket Entry No. 28, p. 42.

[66]Catlin's Motion, Docket Entry No. 28, p. 11.

Engle Martin attempted to contact Lee several times by telephone between September 26, the day after it received notice of Lee's claim, and October 2, 2008, but Lee was out of the country.[67] Lathrum, a claims examiner for Catlin, informed Lee that he had been assigned to the claim in a letter dated October 12, 2008.[68] In December of 2008 Engle Martin informed Lee that Catlin continued to reserve its rights under the policy, updated Lee on the investigation, and made clear that in order to resolve the claim Lee needed to send Engle Martin a copy of the invoice from Emergency Service's roof repair and a copy of Lee's lease agreements with the property's tenants.[69] By February 10, 2009, Engle Martin still had not received from Lee the invoice or the leases.[70] On February 17, 2009, Engle Martin reminded Lee that Catlin had reserved its rights under the policy and was still investigating the claim.[71]

---

[67]Immediate Advice from Engle Martin to Catlin, Oct. 10, 2008, Exhibit A-7 to Catlin's Motion, Docket Entry No. 28, p. 2.

[68]Letter from Lathrum to Lee, Oct. 12, 2008, Exhibit A-9 to id., p. 1.

[69]Letter from Engle Martin to Lee, Dec. 11, 2008, Exhibit A-11 to Catlin's Motion, Docket Entry No. 28, p. 1.

[70]Engle Martin's Updated Report, Exhibit A-12 to Catlin's Motion, Docket Entry No. 28, p. 2.

[71]Letter from Engle Martin to Lee, Feb. 17, 2009, Exhibit A-13 to Catlin's Motion, Docket Entry No. 28, pp. 1-2.

This evidence viewed collectively does not show that Catlin unreasonably delayed investigating the claim, notifying Lee that it was reserving its rights, or explaining to Lee that it needed more information to make a determination on his claim.  Lee offers no summary-judgment evidence that would lead a reasonable juror to conclude that Catlin failed to promptly provide Lee with a reasonable explanation for denying his claim or failed to deny coverage within a reasonable time.

## C.   Prompt Payment of Claims

Lee alleges that Catlin violated the prompt payment of claims provisions of the Texas Insurance Code by:

> (a)   Failing to acknowledge receipt of the Claim, commence investigation of the Claim, and/or request from Plaintiff all items, statements, and forms that [Catlin] reasonably believed would be required within the time constraints provided by Tex. Ins. Code § 542.055;

> (b)   Failing to notify Plaintiff in writing of its acceptance or rejection of the Claim within the applicable time constraints provided by Tex. Ins. Code § 542.056; and/or by

> (c)   Delaying payment of the Claim following [Catlin's] receipt of all items, statements, and forms reasonably requested and required, longer than the amount of time provided by Tex. Ins. Code § 542.058.[72]

---

[72]Plaintiff's Original Petition, Exhibit C to Notice of Removal, Docket Entry No. 1, ¶ 26.

1. <u>Section 542.055</u>

Section 542.055 provides that an insurer shall (1) "acknowledge receipt of the claim," (2) "commence any investigation of the claim," and (3) "request from the claimant all items, statements, and forms that the insurer reasonably believes, at that time, will be required from the claimant" within fifteen days of receiving notice of the claim.  Tex. Ins. Code § 542.055(a).

Catlin received notice of Lee's claim on September 24, 2008,[73] and acknowledged receipt of the claim the next day, on September 25, 2008.[74]  Catlin also assigned Engle Martin to investigate the claim on September 25, 2008,[75] and Engle Martin immediately began attempting to contact Lee.[76]  There is no evidence that within the first fifteen days of the investigation Catlin had reason to believe that it needed to obtain any forms or information from Lee.  Engle Martin's determination that it needed to review the invoice from Emergency Services was not made until November 19, 2008, when it inspected the roof.  Section 542.055(b) provides that "[a]n insurer may make additional requests for information if

---

[73]Fax from AUM to Catlin, Sept. 24, 2008, Exhibit A-3 to Catlin's Motion, Docket Entry No. 28, p. 1.

[74]General Agent New Claim Acknowledgment from Catlin, Sept. 25, 2008, Exhibit A-4 to <u>id.</u>, p. 1.

[75]Fax from Catlin to Engle Martin, Sept. 25, 2008, Exhibit A-5 to <u>id.</u>, p. 1.

[76]Immediate Advice from Engle Martin to Catlin, Oct. 10, 2008, Exhibit A-7 to <u>id.</u>, p. 2.

during the investigation of the claim the additional requests are necessary." Because the evidence shows that Catlin complied with the statute the court will grant Catlin's motion with respect to Lee's claim under Section 542.055.

### 2. Sections 542.056 and 542.058

Section 542.056 provides that an insurer generally must notify a claimant in writing of the acceptance or rejection of a claim, and the underlying reasons for a rejection, within fifteen business days of receiving all items, statements, and forms that are required for the insurer to secure final proof of loss. Tex. Ins. Code § 542.056(a), (c). The insurer may notify the claimant within the same time frame that it needs additional time, but the insurer must accept or reject the claim within 45 days of the date of the additional-time notification. Id. § 542.056(d).

Catlin argues that it did not notify Lee of its rejection of the claim because Catlin never received the invoice and leases it requested, items that are necessary to its final determination concerning coverage.[77] But Catlin fails to substantiate this assertion with competent summary-judgment evidence, such as an affidavit. See Fed. R. Civ. P. 56(c)(1)(A)–(B). Moreover, Catlin has not demonstrated that such documentation was required for it to make its determination. The investigations conducted by Engle

---

[77]Catlin's Motion, Docket Entry No. 28, pp. 12–13.

Martin and PT&C were finished by March of 2009.  Accordingly, there is a genuine issue of material fact as to whether Catlin's delay in notifying Lee of its decision was warranted on the basis that it had not received all items, statements, and forms that were required for it to secure final proof of loss.

Section 542.058 provides that an insurer is liable for statutory damages if, after receiving all items, statements, and forms reasonably requested and required, it delays payment of the claim for a period exceeding the period specified by other applicable statutes or, if other statutes do not specify a period, for more than sixty days.  Tex. Ins. Code § 542.058(a).  As stated previously, there is a genuine issue of material fact as to whether Catlin has received all of the necessary items to make its final determination.  Furthermore, because Catlin does not seek summary judgment on Lee's claim for breach of contract, summary judgment on this claim would be premature.  A determination as to whether Catlin wrongfully delayed payment is dependent on the unresolved issue of whether Catlin is liable under the policy.

The court will therefore deny Catlin's motion with respect to Lee's prompt-payment claims under Section 542.056 and 542.068.

**D.   DTPA Claims**

Lee alleges that Catlin violated the DTPA by engaging in false, misleading, or deceptive acts and practices, Tex. Bus. & Com. Code § 17.46(a), by:

(a)   "Represent[ing] that goods or services [had] sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they [did] not have," id. § 1746(b)(5);

(b)   "Represent[ing] that an agreement confer[red] or involve[d] rights, remedies, or obligations which it [did] not have or involve, or which [was] prohibited by law," id. § 1746(b)(12);

(c)   "Fail[ing] to disclose information concerning goods or services which was known at the time of the transaction when such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed," id. § 1746(b)(24);

(d)   "Generally engag[ing] in unconscionable courses of action while handling the Claim," id. § 1750(a)(3); and

(e)   "Violat[ing] the provisions of the Texas Insurance Code," id. § 1750(a)(4).[78]

Lee states that when he purchased the insurance policy there were no misrepresentations in the policy and that he has never had any conversations with anyone at Catlin about the terms of his insurance policy.[79]   Lee's understanding of the policy was that

---

[78]Plaintiff's Original Petition, Exhibit C to Notice of Removal, Docket Entry No. 1, ¶¶ 28-31.

[79]Deposition of C.K. Lee, Exhibit C to Catlin's Motion, Docket Entry No. 28, p. 42.

Catlin would pay him the replacement value for any kind of damage, including hurricane damage, but he admitted he only read the policy briefly and did not read it in its entirety.[80]  Lee also fails to identify the information that Catlin allegedly failed to disclose in an effort to induce Lee into entering the insurance contract. "In the absence of some specific misrepresentation by the insurer or agent about the insurance, a policyholder's mistaken belief about the scope or availability of coverage is not generally actionable under the DTPA." Sledge v. Mullin, 927 S.W.2d 89, 94 (Tex. App.—Fort Worth 1996, no writ).  Because Lee points to no evidence in the record that supports his misrepresentation or failure-to-disclose claims, Catlin is entitled to summary judgment with respect to those claims.

Catlin is also entitled to summary judgment with respect to Lee's DTPA claims relating to unconscionable conduct and violations of the Texas Insurance Code.  Under the DTPA an "unconscionable action" is defined as "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." Tex. Bus. & Com. Code § 17.45(5).  As discussed above the evidence does not give rise to a claim for bad faith or otherwise show that Catlin intended to deceive Lee in issuing the policy or investigating the claim.  Although Lee's allegations of unfair

---

[80]Id. at 90.

settlement practices are actionable under the DTPA, see id. § 17.50(a)(4), Catlin is entitled to summary judgment on those claims because, as discussed above, a reasonable juror could not conclude that Catlin acted in bad faith in its investigation, made misrepresentations to Lee about the policy, or unreasonably delayed its investigation.

**E.   Fraud Claims**

Lee alleges that Catlin "knowingly or recklessly made false representations as to material facts and/or knowingly concealed all or part of material information from Plaintiff with the intent of inducing Plaintiff to accept a denial and/or underpayment of insurance benefits."[81]  As discussed above there is nothing in the record that could convince a reasonable juror that Catlin knowingly made misrepresentations or concealed material information concerning the policy's coverage or the investigation of Lee's claim.  The court will therefore grant Catlin's motion with respect to Lee's fraud claims.

**F.   Conclusion**

Catlin has demonstrated that there are no genuine issues of material fact with respect to Lee's extra-contractual claims.  The

---

[81]Plaintiff's Original Petition, Exhibit C to Notice of Removal, Docket Entry No. 1, ¶ 32.

court therefore concludes that Catlin has established that it is entitled to judgment as a matter of law with respect to Lee's allegations of (1) common law and statutory bad faith, (2) unfair settlement practices under the Texas Insurance Code, (3) prompt payment of his claim under Section 542.055 of the Texas Insurance Code, (4) DTPA violations, and (5) fraud.  Because there is a genuine issue of fact as to whether Catlin complied with the time frames set out in Sections 542.056 and 542.058 of the Texas Insurance Code, the court concludes that Catlin is not entitled to summary judgment with respect to those claims.

## IV.  Order

For the reasons explained above, Catlin Specialty Insurance Company's Motion for Partial Summary Judgment (Docket Entry No. 28) is **GRANTED in part and DENIED in part**.  Discovery will be completed by March 25, 2011.  The Joint Pretrial Order will be filed by April 1, 2011.  Docket Call will be April 8, 2011, at 4:00 p.m.

**SIGNED** at Houston, Texas, on this 28th day of February, 2011.

SIM LAKE
UNITED STATES DISTRICT JUDGE